22-55898

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**Lauren Souter,**

Plaintiff-Appellant,

**v.**

**Edgewell Personal Care Company; Edgewell Personal Care Brands, LLC; and Edgewell Personal Care LLC,**

Defendant-Appellee

On Appeal from the United States District Court
for the Southern District of California

No. 3:20-cv-1486
Hon. Todd W. Robinson

# BRIEF FOR THE STATE OF CALIFORNIA AS AMICUS CURIAE IN SUPPORT OF APPELLANT AND REVERSAL

ROB BONTA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General
MICHELE VAN GELDEREN
Supervising Deputy Attorney General
HUNTER LANDERHOLM (SBN 294698)
BREE BACCAGLINI (SBN 339408)
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-0751
Email: Hunter.Landerholm@doj.ca.gov
*Attorneys for Amicus Curiae the State of California*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND STATEMENT OF INTEREST ............................ 1

ARGUMENT ............................ 2

I. Deceptive Advertising Claims Pose Fact Questions Generally Inappropriate for Pleading-Stage Resolution ........... 2

II. Courts Are Reluctant to Dismiss Consumer Deception Cases on the Pleadings Because They Pose Inherently Fact-Intensive Questions of Real-World Consumer Behavior ............................ 5

III. Insights About Real-World Consumer Perception Drawn from Behavioral Science and Marketing Literature Underscore that the Reasonable Consumer Standard Inherently Presents Substantial Questions of Fact .................. 13

IV. Courts Should Dismiss Consumer Deception Cases on the Pleadings Only Where No Reasonable Consumer Could Be Misled, Resolving Ambiguities in Perceived Meaning Only with the Benefit of Evidence .......................... 15

V. Appellant Adequately Pled a Claim that the Hand Wipes Labels Mislead Consumers About Their Effectiveness and Allergenic Properties ............................ 20

VI. The Trial Court Erred Because It Made Assumptions About How Reasonable Consumers Would Interpret the Labeling Rather than Allowing Evidence to Guide that Determination ............................ 23

CONCLUSION ............................ 27

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Philatelic Soc'y v. Claibourne*,
3 Cal. 2d 689 (1935) ........ 3
*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ........ 4
*Bank of the W. v. Superior Ct.*,
2 Cal. 4th 1254 (1992) ........ 3
*Becerra v. Dr Pepper/Seven Up, Inc.*,
945 F.3d 1225 (9th Cir. 2019) ........ 17
*Bell v. Publix Super Markets, Inc.*,
982 F.3d 468 (7th Cir. 2020) ........ 6, 9, 10, 11, 12, 13, 17, 19, 21
*Brady v. Bayer Corp.*,
26 Cal. App. 5th 1156 (2018) ........ 4, 7, 10, 13, 16, 17, 21, 22, 24
*Brockey v. Moore*,
107 Cal. App. 4th 86 (2003) ........ 19
*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ........ 2, 3
*Chapman v. Skype, Inc.*,
220 Cal. App. 4th 217 (2013) ........ 5
*Colgan v. Leatherman Tool Grp., Inc.*,
135 Cal. App. 4th 663 (2006) ........ 4, 6
*Danone, US, LLC v. Chobani, LLC*,
362 F. Supp. 3d 109 (S.D.N.Y. 2019) ........ 11
*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2009) ........ 17
*Dumont v. Reily Foods Co.*,
934 F.3d 35 (1st Cir. 2019) ........ 12, 13, 26
*Ebner v. Fresh Inc.*,
838 F.3d. 958 (9th Cir. 2016) ........ 17, 19
*Freeman v. Time*,
68 F.3d 285 (9th Cir. 1995) ........ 16
*Friedman v. AARP, Inc.*,
855 F.3d 1047 (9th Cir. 2017) ........ 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Hill v. Roll Internat. Corp.*,
195 Cal. App. 4th 1295 (2011)........................................................ 17

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009)................................................................... 3

*Kasky v. Nike, Inc.*,
27 Cal. 4th 939 (2002)........................................................... 3, 5, 17

*Lavie v. Procter & Gamble Co.*,
105 Cal. App. 4th 496, (2003)........................................... 4, 6, 21, 24

*Linear Tech. Corp. v. Applied Materials, Inc.*,
152 Cal. App. 4th 115 (2007)............................................................ 5

*Macormic v. Vi-Jon, LLC*,
No. 4:20CV1267 HEA, 2021 WL 6119166 (E.D. Mo. Aug. 6, 2021) ..... 27

*Mier v. CVS Pharmacy, Inc.*,
No. SACV2001979DOCADS, 2021 WL 1559367 (C.D. Cal. Mar. 22, 2021)................................................................................................ 27

*Moore v. Mars Petcare US*,
966 F.3d 1007 (9th Cir. 2020)..................................................... 4, 16

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021)......................................................... 4, 11

*Moreno v. Vi-Jon, LLC.*,
No. 21-56370, 2022 WL 17668457 (9th Cir. Dec. 14, 2022)................... 27

*Reid v. Johnson & Johnson*,
780 F.3d 952 (9th Cir. 2015)............................................................ 16

*Resort Car Rental System, Inc. v. F.T.C.*,
518 F.2d 962 (9th Cir. 1975)............................................................ 19

*Salazar v. Target Corp.*,
83 Cal. App. 5th 571 (2022)........................................... 6, 8, 10, 13

*Salazar v. Walmart, Inc.*,
83 Cal. App. 5th 561 (2022)............................... 8, 9, 10, 13, 18, 19, 24, 26

*Simpson v. The Kroger Corp.*,
219 Cal. App. 4th 1352 (2013)........................................................ 17

*Skinner v. Ken's Foods*,
53 Cal. App. 5th 938 (2020)............................................................. 9

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ... 19
*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008) ... 3, 4, 5, 7, 10, 15, 16

**STATUTES**

California Business & Professions Code § 17204 ... 1
California Business & Professions Code § 17536 ... 1
California Business & Professions Code §§ 17200 *et seq.* ... 1, 2, 3, 4, 6, 18
California Business & Professions Code §§ 17500 *et seq.* ... 1, 3, 4, 6
California Civil Code §§ 1750 *et seq.* ... 1, 4, 18
California Commercial Code § 2313 ... 4

**OTHER AUTHORITIES**

Allan J. Kimmel, *Psychological Foundations of Marketing* (2d ed. 2018). 14, 15
Lauren E. Willis, *Decisionmaking and the Limits of Disclosure: The Problem of Predatory Lending: Price*, 65 Md. L. Rev. 707 (2006) ... 14
Omri Ben-Shahrar & Carl E. Schneider, *More than You Wanted to Know: The Failure of Mandated Disclosure* (2014) ... 14
Robert East et al., *Consumer Behaviour: Applications in Marketing* (2d ed. 2013) ... 15
Tilde Heding et al., *Brand Management: Research, Theory and Practice* (2d ed. 2016) ... 14

## INTRODUCTION AND STATEMENT OF INTEREST

The California Attorney General, on behalf of the State of California, submits this brief under Federal Rule of Appellate Procedure 29(a) to assist the Court in analyzing and applying the standards for pleading false advertising claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, and Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* The Attorney General is vested with the authority to enforce the first two of these statutes, and has an interest in ensuring that all three laws achieve their consumer-protective purposes. Cal. Bus. & Prof. Code §§ 17204, 17536. Accordingly, although California takes no position on the ultimate merits of this case, it has a strong interest in ensuring the appropriate application of its consumer protection laws to promote their enforcement—whether through government actions or by private parties in their critical role as a supplement to the Attorney General's enforcement efforts. This case provides an opportunity to reaffirm the principle that factual questions related to false advertising claims generally should not be resolved on the pleadings. This will preserve the ability of private parties and prosecutors, including the Attorney General, to enforce California's core consumer protection laws.

The district court erred by concluding that the case could be resolved on the pleadings. Well-settled law recognizes that false advertising cases are inherently

fact-intensive, and therefore should not be dismissed at the pleading stage unless the allegations compel the conclusion as a matter of law that reasonable consumers would not be misled by the challenged conduct. That approach is of significant importance because real-world consumer decision-making is often more hurried, and consumer perception considerably more limited, than might be intuitive—especially for small-dollar purchases. Because evidentiary development can shed light on these matters, courts should be reluctant to dismiss consumer-labeling claims by making assumptions about consumer perception.

The district court's decision should be reversed because it strayed from those principles. The court improperly relied on its own intuitions about consumer perception and its own factual conclusions to resolve questions of fact prematurely on the pleadings.

## ARGUMENT

### I. DECEPTIVE ADVERTISING CLAIMS POSE FACT QUESTIONS GENERALLY INAPPROPRIATE FOR PLEADING-STAGE RESOLUTION

The Unfair Competition Law is a broad and flexible consumer protection statute. It provides a mechanism for remedying "wrongful business conduct in whatever context such activity might occur." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999) (citation omitted). The statute is thus "intentionally framed in . . . broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's

invention would contrive.'" *Id.* (quoting *Am. Philatelic Soc'y v. Claibourne*, 3 Cal. 2d 689, 698 (1935)).

The Unfair Competition Law prohibits "unfair competition," defined in part as any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The text is written in the disjunctive, so an act or practice may be challenged if it fits within any one of these "three varieties," or prongs, of unfair competition. *Cel-Tech*, 20 Cal. 4th at 180; *In re Tobacco II Cases*, 46 Cal. 4th 298, 311–12 (2009). Under the "fraudulent" prong, the one at issue in this case, litigants "need not plead and prove the elements of a tort," but must only "'show that members of the public are likely to be deceived.'" *Bank of the W. v. Super. Ct.*, 2 Cal. 4th 1254, 1267 (1992) (citation omitted); *see also Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

In the context of deceptive marketing claims, both the Unfair Competition Law and the False Advertising Law prohibit advertising that is false, as well as statements that, "although true, [are] either actually misleading or which [have] a capacity, likelihood or tendency to deceive or confuse the public." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002) (citation omitted); *see also Williams*, 552 F.3d at 938.

Claims under the Unfair Competition Law's "fraudulent" prong and under the False Advertising Law are governed by the "reasonable consumer" test.[1] *Williams*, 552 F.3d at 938. Unless advertising targets a particular population, courts evaluate whether it is misleading from the vantage point of an "ordinary consumer acting reasonably under the circumstances" who "is not versed in the art of inspecting and judging a product[.]" *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 682 (2006) (citation omitted); *see also Moore v. Mars Petcare US*, 966 F.3d 1007, 1017–18 (9th Cir. 2020). Such a consumer need be neither "'exceptionally acute and sophisticated'" nor "wary or suspicious." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 509–10, 512 (2003) (citation omitted); *see also Mars Petcare US*, 966 F.3d at 1018 (evaluating pet food label from vantage of reasonable consumers, not veterinarians).[2]

---

[1] In the context of deception claims, the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*, likewise applies the "reasonable consumer" standard. *Williams*, 552 F.3d at 938. Reversal on the quasi-contract and express warranty claims is also warranted. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (holding that "entic[ement]" through "'false and misleading' labeling" causing "unjust enrich[ment]" is "sufficient to state a quasi-contract cause of action"); *Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1177–79 (express warranty created by "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis for the bargain" (quoting Cal. Com. Code § 2313)).

[2] In *Moore v. Trader Joe's Co.*, 4 F.4th 874, 883 (9th Cir. 2021), this Court suggested that consumers of "Manuka honey, a niche specialty product," "would likely know more than most about the production of the product. . . ." *Id.* at 884. By contrast, reasonable consumers of everyday products do not have such knowledge. *See id.*

This Court has recognized that whether a business practice is deceptive is usually a factual question inappropriate for dismissal on the pleadings. *Williams*, 552 F.3d at 938. That is because evaluating advertising's "capacity, likelihood or tendency to deceive or confuse[,]" *Kasky*, 27 Cal. 4th at 951 (citation omitted), requires "consideration and weighing of evidence from both sides[,]" which is not possible at the pleading stage. *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (2007) (citation omitted); *see Williams*, 552 F.3d at 939. Because of the central role evidence plays in evaluating capacity to deceive or confuse, courts should decide those issues on motions to dismiss only in "rare situation[s,]" *Williams*, 552 F.3d at 939, where the allegations "compel the conclusion as a matter of law that consumers are not likely to be deceived." *Chapman v. Skype, Inc.*, 220 Cal. App. 4th 217, 227 (2013) (citing cases).

## II. COURTS ARE RELUCTANT TO DISMISS CONSUMER DECEPTION CASES ON THE PLEADINGS BECAUSE THEY POSE INHERENTLY FACT-INTENSIVE QUESTIONS OF REAL-WORLD CONSUMER BEHAVIOR

An important reason for allowing consumer deception cases to proceed past the pleadings in most circumstances is the recognition that how reasonable consumers interpret commercial messaging in the real-world marketplace is not always obvious. As the California Court of Appeal recently put it, in assessing the "reasonable consumer" standard, "[w]hat matters . . . is how consumers actually behave—how they perceive advertising and how they make decisions. These are

matters of fact, subject to proof that can be tested at trial, even if as judges we might be tempted to debate and speculate further about them." *Salazar v. Target Corp.*, 83 Cal. App. 5th 571, 579 (2022) (quoting *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 481 (7th Cir. 2020)). In effect, then, limiting dismissal to "rare situations" is an exercise in judicial restraint—an acknowledgement that courts cannot assume reasonable consumers act with perfect knowledge, deliberation, or analytical rigor when evaluating potentially deceptive advertising claims in real-world situations.

Courts applying California's Unfair Competition and False Advertising Laws have long recognized that even reasonable consumers may lack the time, motivation, and background to thoroughly analyze advertising messaging. As noted above, reasonable consumers are "not versed in the art of inspecting and judging a product," *Colgan*, 135 Cal. App. 4th at 682, may lack "'acu[ity] and sophisticat[ion,]'" and may be neither "wary [n]or suspicious." *Lavie*, 105 Cal. App. 4th at 509–10, 512 (citation omitted). They are "ordinary" consumers who act "reasonably[,]" but reasonableness is not a static concept, and must be evaluated in light of the surrounding "circumstances." *See Colgan*, 135 Cal. App. 4th at 682 (quoting *Lavie*, 105 Cal. App. 4th at 512–13). The standard insists on the reasonable exercise of consumers' human faculties, but equally recognizes their human limitations, both situational (the "circumstances") and cognitive (lack of

acuity, sophistication, wariness, suspicion). The law demands situational reasonableness, but not extraordinary composure or superhuman rationality.

In applying this standard at the pleading stage, courts have increasingly emphasized the distinction between how real-world consumers assess advertising claims and typical modes of legal analysis, such as statutory or contract interpretation. In doing so, they have pointed to insights about real-world consumer behavior drawn from behavioral science and marketing publications. For example, the California Court of Appeal in *Brady v. Bayer Corp.* reviewed claims that the front-label brand name "One A Day" misled consumers of a vitamin gummy product into believing the serving size was one gummy per day, where the back label disclosed the actual daily serving was two gummies. 26 Cal. App. 5th 1156 (2018). Relying in part on marketing literature, the court rejected the notion that "reasonable consumers of vitamins are back-label scrutinizers[]" as "untenable[,]" noting that while "many people—including some judges and lawyers—would make such an inquiry[,]" "other consumers—knowing they have very little scientific background[,]" would not.[3] *Id.* at 1174.

A recent pair of California Court of Appeal cases similarly emphasizes the centrality of real-world consumer perception and behavior to the "reasonable

[3] This Court has concurred in that approach to back labels that contradict front labels. *Williams*, 552 F.3d at 939–40 (consumers not "expected to look beyond misleading representations on the front of the box").

consumer" standard. The cases, *Salazar v. Walmart* and *Salazar v. Target*, resulted in nearly identical opinions in two cases brought by the same plaintiff against different retailers. In both cases, the Court of Appeal reversed pleading-stage dismissals where the plaintiff alleged he was misled to believe that store-brand white baking chips contained genuine white chocolate. *Salazar v. Walmart, Inc.*, 83 Cal. App. 5th 561, 567 (2022); *Salazar v. Target Corp.*, 83 Cal. App. 5th 571 (2022). In *Salazar v. Walmart*, arguably the more instructive of the two cases,[4] Plaintiff Salazar alleged that the following aspects of Walmart's White Baking Chips misled him to believe they contained white chocolate: "(1) their label describes them as 'white,' (2) their label depicts the product, which look like white chocolate chips, and (3) the product is sold next to other chocolate products." *Salazar v. Walmart*, 83 Cal. App. 5th at 564–65. Notably, neither the ingredients panel nor any other part of the label made any express mention of chocolate. *Id.* at 567.

[4] The *Walmart* and *Target* opinions are almost identical, down to lengthy passages of duplicated text. For ease of citation, this brief focuses on the *Salazar v. Walmart* case because the labels in that case made no express mention of chocolate, whereas the price label in the *Target* case contained the phrase "WHT CHOCO." *Compare Salazar v. Walmart*, 83 Cal. App. 5th at 564–65, 567 *with Salazar v. Target*, 83 Cal. App. 5th at 576. And yet, even without that element of express actual falsehood, the allegations in *Salazar v. Walmart* equally cleared the reasonable consumer standard—at least at the pleading stage.

Even as the Court of Appeal acknowledged that the "White Baking Chips' packaging may not have any false statements," it nevertheless held that the trial court erred by dismissing the consumer deception claims. *Id.* In so doing, the court reiterated the rule that "literally true statements 'couched in such a manner that [are] likely to mislead or deceive the consumer . . . [are] actionable.'" *Id.* (quoting *Skinner v. Ken's Foods*, 53 Cal. App. 5th 938, 949 (2020)). Because in context, the "white" in "White Baking Chips" "could reasonably be interpreted as shorthand for 'white chocolate[,]" the fact that the same word might also be interpreted as "an adjective [that] describes [the Baking Chip's] color" was unimportant for purposes of demurrer. *Id.* at 569. In essence, the court resolved any labeling ambiguity in favor of the plaintiff at the pleading stage. It concluded on the basis of the plaintiff's reasonable interpretation of the potentially ambiguous labeling that he "plausibly alleges that 'a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled'[.]" *Id*. at 569–70.

As justification for reaching that outcome in the *Salazar* cases, the Court of Appeal emphasized the importance of considering evidence when weighing difficult-to-predict questions of consumer behavior. In making that point, the court relied heavily on the Seventh Circuit's opinion in *Bell v. Publix Super Markets, Inc.*, discussed below. Quoting *Bell*, the *Salazar* court emphasized that consumer

deception cases are rarely ripe for dismissal on the pleadings because the reasonable consumer standard requires evaluating "how consumers *actually behave*—how they perceive advertising and how they make decisions." *Salazar v. Walmart*, 83 Cal. App. 5th at 567 (emphasis added) (quoting *Bell*, 982 F.3d at 481). And, echoing *Brady*, the *Salazar* court distinguished real-world consumer perception from the type of judicial analysis in which courts typically engage at the pleading stage: "These are matters of fact, subject to proof that can be tested at trial, even if as judges we might be tempted to debate and speculate further about them." *Id*. (quoting *Bell*, 982 F.3d at 481).

Two federal courts of appeals have similarly pointed to the distinction between how judges and lawyers typically analyze facts and what the law expects from reasonable consumers. Their opinions stress this distinction as an important reason why judges should allow evidentiary development rather than making assumptions about consumer behavior.

In *Bell*—the case cited extensively in both *Salazar* decisions—the Seventh Circuit considered a product labeled "100% grated parmesan cheese" that disclosed its non-cheese ingredients only on the back label. *Bell*, 982 F.3d at 474. Citing this Court's opinion in *Williams* and applying several state consumer laws, including California's, *Bell* held that the district court erred in dismissing the plaintiff's claim that the "100%" label was misleading. The Seventh Circuit noted

that "[m]any reasonable consumers do not instinctively parse every front label or read every back label before placing groceries in their carts." *Id.* at 476; *see also Trader Joe's Co.*, 4 F.4th at 884 (recognizing *Bell*'s reasoning that consumers are likely to exhibit less care when purchasing everyday items). It therefore concluded that the district court erred by "attributing to ordinary supermarket shoppers a mode of interpretation more familiar to judges trying to interpret statues in the quiet of their chambers." *Bell*, 982 F.3d at 476. "Consumer-protection laws do not impose on average consumers an obligation to question the labels they see and to parse them as lawyers might for ambiguities, especially in the seconds usually spent picking a low-cost product." *Id.* (approvingly citing and parenthetically quoting *Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 123 (S.D.N.Y. 2019) ("[A] parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow, is not likely to study with great diligence the contents of a complicated product package, searching for and making sense of fine-print disclosures . . . . Nor does the law expect this of the reasonable consumer.")).

Citing behavioral research as support, the Seventh Circuit in *Bell* further opined, "We doubt it would surprise retailers and marketers if evidence showed that many grocery shoppers make quick decisions that do not involve careful consideration of all information available to them." *Bell*, 982 F.3d at 481 (citing four sources); *cf. Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013)

(quoting, at pleading stage, consumer behavior research in support of conclusion that price discounts matter to consumers). The *Bell* court concluded that questions of deception "may not be answered as a matter of law simply because lawyers can construe an ambiguous claim in a way that would not be deceptive. Plaintiffs are entitled to present evidence on how consumers actually understand these labels." *Bell*, 982 F.3d at 480.

The First Circuit in *Dumont v. Reily Foods Co.* also considered a deceptive labeling issue on the pleadings, and, in allowing the case to proceed, similarly contrasted how real-world consumers understand labels with how an expert conducting a rigorous analytical review might construe them. 934 F.3d 35 (1st Cir. 2019). The front label at issue promised "Hazelnut Crème" coffee, but the back label disclosed that the product contained no hazelnut. *Id.* at 37–38. The *Dumont* court disapproved of envisioning the reasonable consumer as an "erudite reader of labels, tipped off by the accent grave on the word 'crème,' and armed perhaps with several dictionaries, a bit like a federal judge reading a statute." *Id.* at 40. Expressing doubt that reasonable consumers "would exhibit such linguistic precision[,]" the court concluded "we think it best that [the fact finder] decide on a full record whether the challenged label 'has the capacity to mislead' reasonably acting, hazelnut-loving consumers." *Id.* at 40–41 (citation omitted).

Taken together, these cases stand for the ultimately unremarkable proposition that the reasonable consumer is a real-world consumer. They explain why expectations for how consumers must reasonably interpret marketing messages should be developed in light of an understanding of the real-life circumstances that shape consumer decision-making—an understanding that courts are better equipped to reach with the assistance of evidence. As the *Brady*, *Salazar*, *Bell*, and *Dumont* courts have all recognized, the deep, nuanced mode of analysis a trial judge typically applies in deciding a motion to dismiss is worlds apart from the serial, fast-paced purchase decisions made by everyday consumers on real-world shopping trips. Because evidence can shed light on how reasonable consumers really behave, consumer deception cases inherently present significant issues of fact that should nearly always survive the pleadings.

## III. INSIGHTS ABOUT REAL-WORLD CONSUMER PERCEPTION DRAWN FROM BEHAVIORAL SCIENCE AND MARKETING LITERATURE UNDERSCORE THAT THE REASONABLE CONSUMER STANDARD INHERENTLY PRESENTS SUBSTANTIAL QUESTIONS OF FACT

Established behavioral science supports applying a less lawyerly, more "real-world" lens to consumer deception issues. For example, research has shown that information overload can confuse consumers or promote reliance on heuristic decision-making, in which the consumer simplifies a decision by examining only certain aspects of it. Lauren E. Willis, *Decisionmaking and the Limits of Disclosure: The Problem of Predatory Lending: Price*, 65 Md. L. Rev. 707, 766–

71 (2006). Decision simplification sometimes means skipping past disclaimers: consumers “ignore [disclosure] data to make their task more manageable[,]” in order to avoid opportunity costs, or because disclosures look unimportant or they believe they already know what the disclosures will say. Omri Ben-Shahar & Carl E. Schneider, *More than You Wanted to Know: The Failure of Mandated Disclosure* 64–78 (2014). Similarly, consumers may “satisfice” when faced with time constraints, forgoing exhaustive product investigation for time savings. Willis, *supra*, at 742, 767–69. These shortcuts are more likely for low-dollar purchases: where consumers perceive the stakes to be low, decision-making “involves a simpler process of choice where heuristics are more easily applied.” Tilde Heding et al., *Brand Management: Research, Theory and Practice* 93 (2d ed. 2016). It is reasonable—and decidedly human—for consumers to simplify their choices in these ways when pressed for time and forced to make rapid decisions about each of many routine purchases in the modern marketplace.

Marketers know that real-world consumers take shortcuts, and design their advertising accordingly. One marketing text points out that consumers’ tendency to economize cognitive processing means that advertisers “must counter consumers’ tendencies to screen out marketing-related stimuli or remain insensitive to them[.]” Allan J. Kimmel, *Psychological Foundations of Marketing* 87 (2d ed. 2018). In light of the 50,000 products available in the typical supermarket, “*the average*

*package has about one-tenth of a second to make an impression on the shopper*." *Id.* at 90–91 (emphasis added). That timeframe underscores why it is improper to treat the reasonable consumer like a lawyer or judge. As another marketing text frames the issue, "although rational decision models might suggest what people *ought to do* (normative), they are a poor guide for what people *actually do* (descriptive)." Robert East et al., *Consumer Behaviour: Applications in Marketing* 6 (2d ed. 2013) (emphasis in original).

Thus, both a recent line of cases and behavioral science findings lend support to the notion that reasonable consumers approach advertising differently than courts or lawyers parsing statutes or contracts. Courts should generally consider evidence about how consumers behave in the real world, rather than dismissing cases based on intuitions that may suffer from incomplete information. Evidence like consumer or expert testimony can help courts assess advertising through the eyes of a reasonable consumer and better understand the market circumstances and everyday realities within which consumers make purchase decisions.

## IV. COURTS SHOULD DISMISS CONSUMER DECEPTION CASES ON THE PLEADINGS ONLY WHERE NO REASONABLE CONSUMER COULD BE MISLED, RESOLVING AMBIGUITIES IN PERCEIVED MEANING ONLY WITH THE BENEFIT OF EVIDENCE

The above authorities buttress this Court's repeated admonition that motions to dismiss consumer deception cases should be granted only in "rare situation[s.]" *Williams*, 552 F.3d at 939; *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir.

2015); *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017). But how do courts identify this "rare" species of case in the wild?

The state Court of Appeal in *Brady v. Bayer Corp.* synthesized California cases and articulated two categories of these rare situations applicable in labeling cases. First, a claim that illustrates "wishful thinking" on the plaintiff's part or "runs counter to ordinary common sense or the obvious nature of the product . . . is fit for disposition" at the pleading stage. *Brady*, 26 Cal. App. 5th at 1165–66; *see Mars Petcare US*, 966 F.3d at 1018 ("[I]f common sense would not lead anyone to be misled, then the claim may be disposed of at a motion to dismiss stage."). Second, where there are "qualifiers sufficiently prominent on the *front* of the product" such that "[t]here [is] no need to look at the back" because the truth is "unavoidably clear" from the front label, dismissal may be appropriate. *Brady*, 26 Cal. App. 5th at 1169 (emphasis in original); *see Mars Petcare US*, 966 F.3d at 1017.

In both those types of cases, California courts and federal courts applying California law dismiss false advertising causes of action on the pleadings because the facts alleged make clear that *no* reasonable consumer could be misled. *See, e.g.*, *Freeman v. Time*, 68 F.3d 285, 289 (9th Cir. 1995) ("*no* reasonable reader could ignore [the qualifying language] . . ."); *Williams*, 552 F.3d at 939 (explaining that dismissal was appropriate where it was "impossible for the plaintiff to prove

that a reasonable consumer was likely to be deceived”); *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1229 (9th Cir. 2019) (“*no* reasonable consumer would assume . . .”); *Ebner v. Fresh Inc.*, 838 F.3d 958, 967 (9th Cir. 2016) (“*no* reasonable consumer expects . . .”); *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1161 (9th Cir. 2009) (“*no* reasonable consumer would have been deceived . . .”); *Brady*, 26 Cal. App. 5th at 1166, 1168 (referring to standard as “*no* reasonable consumer would in fact be misled” and “*no* reasonable consumer could be deceived”); *Simpson v. The Kroger Corp.*, 219 Cal. App. 4th 1352, 1372 (2013) (“*No* reasonable person could . . . believ[e] . . .”); *Hill v. Roll Int’l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011) (“*no* reasonable consumer would be misled . . .”) (emphasis added, all). That narrow ground for dismissal on the pleadings flows logically from the “reasonable consumer” standard—a standard that requires evaluation of the fact-intensive questions of how reasonable consumers would perceive the challenged advertising and whether such advertising has the “capacity, likelihood or tendency to deceive or confuse” them. *Kasky*, 27 Cal. 4th at 951 (citation omitted).

Conversely, where there is any question about how real-world consumers would interpret arguably ambiguous messaging, or any other doubt about how real-world consumers would understand advertising, evidence can resolve those fact issues, and dismissal on the pleadings is inappropriate. *See Bell*, 982 F.3d at 493

(Kanne, J., concurring) (applying consumer laws of multiple states, including California's Unfair Competition Law and Consumers Legal Remedies Act) ("Just as important, however, is the corollary to this principle: that if a plaintiff's interpretation of a challenged statement is *not* facially illogical, implausible, or fanciful, then a court may *not* conclude that it is nondeceptive as a matter of law." (emphasis in original)).

The *Salazar* court recently applied this rule in its discussion of Walmart's White Baking Chips, holding that dismissal was improper because at least one reasonable interpretation of the label was possibly deceptive:

> "[W]hite" can sometimes describe the quality of the food, not just its color. We therefore disagree . . . that 'white' in the context of baking chips could *only* be reasonably understood as "defin[ing] the color of the food" as a matter of law. . . . [¶] [T]he White Baking Chips' label cannot "only be read" in one way that "eliminates any possibility of deception." . . . [¶] Rather, "white" also could reasonably be interpreted as shorthand for "white chocolate." . . . A reasonable consumer might know there are white chocolate chips used for baking while not knowing that white-colored baking chips that do not contain white chocolate exist.

*Salazar v. Walmart*, 83 Cal. App. 5th at 568–69 (citations omitted). Where more than one interpretation may plausibly be drawn from labeling, courts should allow evidentiary development—which could include consumer or expert testimony—that would tend to show whether "a significant portion" of consumers would fall

prey to the misleading interpretation.[5] *See Ebner*, 838 F.3d at 965 (standard is "significant portion of the general consuming public or of targeted consumers").

That is the case even when the challenged advertisement is part of the pleadings that a court considers when ruling on a motion to dismiss. While it is true that "the primary evidence in a false advertising case is the advertising itself[,]" *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003), primary does not mean exclusive. Even when judges doubt, based on the advertising standing alone, that deception is likely, they should generally consider evidence to avoid substituting their own impressions for those of the reasonable consumer. That approach both empowers courts to resolve ambiguities with the benefit of evidence and recognizes the reality that "'[d]eceptive advertisements often intentionally use ambiguity to mislead consumers while maintaining some level of deniability about the intended meaning.'" *Salazar v. Walmart*, 83 Cal. App. 5th at 568 (quoting *Bell*, 982 F.3d at 477).

---

[5] Such an approach conforms to this Court's rule that "[a]dvertising capable of being interpreted in a misleading way should be construed against the advertiser." *Resort Car Rental System, Inc. v. F.T.C.*, 518 F.2d 962, 964 (9th Cir. 1975). It also parallels the general manner in which courts evaluate motions to dismiss where a complaint's allegations are susceptible to more than one possible explanation: "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## V. APPELLANT ADEQUATELY PLED A CLAIM THAT THE HAND WIPES LABELS MISLEAD CONSUMERS ABOUT THEIR EFFECTIVENESS AND ALLERGENIC PROPERTIES

The district court erred in dismissing Appellant's consumer deception claims on the pleadings because it assumed, without evidence, that reasonable consumers would interpret the label in one particular manner. Because that assumption is subject to dispute, and because evidence could tend to show how reasonable consumers would *in fact* interpret the labels at issue, this Court should reverse the judgment and allow the case to proceed.

On the straightforward facts alleged, it is not possible to conclude that no reasonable consumer would be misled by the hand wipes label at issue. Defendants "manufacture, label, market, promote, advertise, and sell" Wet Ones brand hand wipes containing the active ingredient benzalkonium chloride. ER-018 ¶ 6; ER-021 ¶ 23.[6] The wipes' front label says the product "kills 99.99% of germs." ER-021 ¶ 24; ER-022 ¶ 26. The back label says the hand wipes "kill 99.99% of germs and wipe away dirt, providing a better clean than hand sanitizers." ER-021 ¶ 24; ER-023 ¶ 35. The products tout this near universal effectiveness without qualification or hedging, and without disclaimers or disclosures regarding particular types of germs they cannot kill. ER-021–023. A reasonable consumer of hand wipes comes

[6] "ER" citations are to Appellant's Excerpts of Record, Docket Entry 16, filed January 23, 2023.

to these claims without sophisticated knowledge of the science behind germicide, including things like what benzalkonium chloride is, how it works, or how its properties compare to other methods of cleaning hands. *See Brady*, 26 Cal. App. 5th at 1174 (consumers may “have very little scientific background”); *Lavie*, 105 Cal. App. 4th at 509–10, 512 (reasonable consumers “may lack acu[ity] and sophisticat[ion]”; may be neither “wary [n]or suspicious”) (citation omitted). In the brief time consumers spend scanning a label, they form an impression and act upon it, as advertisers know. *See* Sections II & III, *supra*; *Bell*, 982 F.3d at 476, 481.

Under such circumstances, there is at the very least ambiguity as to how reasonable consumers might interpret the label at issue, with several different interpretations possible. *See* Section IV, *supra* (plausible ambiguity in labeling should be construed in favor of the consumer at the pleading stage). First, it is plausible that a real-world consumer could understand “kills 99.99% of germs” to mean that the products are effective against all but 1 in 10,000 *germ species* that *might be found* on their hands. A second consumer might conclude that the products will kill 9,999 out of every 10,000 *individual germs* on their hands prior to application, leaving only 0.01% of those individual germs alive. A third consumer could understand the claim in simpler, less precise terms, as an assurance akin to the following: “don’t worry—when it comes to hand germs, these wipes take care of virtually everything you need to worry about.”

All three consumers would be deceived if the following facts alleged by the Appellant are true, as they are assumed to be at this stage. According to the Second Amended Complaint, the active ingredient in the hand wipes does not kill, or is less than fully effective against, numerous types of germs found on hands and responsible for tens of millions of cases of illness each year in this country. ER-024–030 ¶¶ 45–87. These include norovirus, HPV, "the virus responsible for COVID-19," C. difficile, and cryptosporidium. *Id.* Appellant alleges the organisms she points to account for "significantly more than 0.01% of 'germs' found on hands." ER-022 ¶ 28. She also cites a study showing that a sanitizer containing the same active ingredient found in Defendants' products, but at a higher concentration, killed only 46% of the germs on subjects' hands in a test simulating real-world conditions. ER-031 ¶¶ 90–95. If proven, these facts would render the challenged label misleading under each of the three plausible interpretations discussed above. Indeed, the allegations arguably render the claim that the products "kill 99.99% of germs" literally false. *See Brady*, 26 Cal. App. 5th at 1167 ("[T]here is no protection for literal falseness"). Plaintiff has therefore sufficiently stated a claim as to the effectiveness labeling, and this case should be decided on the evidence the parties develop.

Likewise, a consumer could reasonably interpret the label's "hypoallergenic" claim the way that word is defined, according to a dictionary source cited in the

Second Amended Complaint: "designed to reduce or minimize the possibility of an allergic response, as by containing *relatively few or no potentially irritating substances*." ER-032 ¶ 101 (emphasis added). Appellant details the products' potentially irritating substances across 15 complaint paragraphs. ER-033–35 ¶¶ 105–119. Whether a reasonable consumer would understand "hypoallergenic" to embrace products that contain the seven potentially irritating substances Appellant identifies is a fact question. Consumers could plausibly be surprised to discover that products that chose to draw their attention with a claim to be low on allergens really features a top-ten allergen as its active ingredient, as Appellant has alleged. ER-033 ¶¶ 106, 109. Dismissal was inappropriate because it is not possible to conclude that no reasonable consumer would be misled on the facts alleged. *See* Section IV, *supra*.

## VI. THE TRIAL COURT ERRED BECAUSE IT MADE ASSUMPTIONS ABOUT HOW REASONABLE CONSUMERS WOULD INTERPRET THE LABELING RATHER THAN ALLOWING EVIDENCE TO GUIDE THAT DETERMINATION

The trial court did not consider the above possibilities. Instead, it granted dismissal in part by imposing its own view of how reasonable consumers would interpret the challenged packaging. With respect to the "kills 99.99% of germs" label, the district court leapt to the conclusion that consumers would expect the products to kill only germs that cause diseases that "are typically prevented by ensuring one's hands are clean." ER-012:1–3, 5–8. In doing so, the district court

effectively qualified the label's words, even though the label contains no such qualifier. According to the district court, "[t]here are diseases that exist that may be transmissible by hand but that would not be prevented by washing one's hands or using hand sanitizers; thus a reasonable consumer would not purchase Wet Ones with the anticipation of preventing those diseases." ER-012:9–12.

That reasoning runs afoul of two important principles of the case law, warranting reversal. First, it treats consumers of an everyday product as knowledgeable experts, expecting them to understand the ways in which specific types of germs may be killed and the relative effectiveness of various methods. But the law—and common sense—counsels that consumers are often unsophisticated. *See Lavie*, 105 Cal. App. 4th at 509–10, 512; *Brady*, 26 Cal. App. 5th at 1174 (consumers may "have very little scientific background").

Second, the district court seized on a single (strained) interpretation of a label that simply states that the product "kills 99.99% of germs," without evidence that consumers would necessarily interpret the label the same way it chose to. *See Salazar v. Walmart*, 83 Cal. App. 5th at 568–569 (other plausible interpretations should not be ruled out at the pleading stage). After all, contrary to the district court's interpretation, that statement is a general assertion of the percentage of germs that *Wet Ones* kill, made without comparative reference to other methods of

cleaning hands.[7] ER-022**.** The district court's reasoning amounts to a determination as a matter of law that reasonable consumers would necessarily read a specific implied qualifier into an unqualified statement—effectively transforming "kills 99.99% of germs" to "kills 99.99% of the germs that are typically killed by other cleaning methods." As shown in Section V above, there are other plausible interpretations of the challenged label that do tend to mislead; the district court either failed to consider them or ruled them out without evidence.

The district court similarly erred by assuming how reasonable consumers would interpret the "hypoallergenic" labeling. First, the court concluded that "Plaintiff fails to allege . . . that a reasonable consumer, after reading that the product is 'hypoallergenic,' would assume that Wet Ones has *no potential allergens*." ER-014:8–10 (emphasis added)**.** By the court's reasoning, the labeling would be misleading only if consumers necessarily viewed "hypoallergenic" as ruling out the presence of *any* possible allergen. That interpretation imposed too high a bar on Appellant. Evidence could show that consumers interpret "hypoallergenic" to mean that the products have relatively *few* allergens, in line with the definition cited by Appellant. *See* ER-032 ¶ 101. In that case, there is a

---

[7] Moreover, the back label arguably contradicts the district court's interpretation. It says that Wet Ones "provid[e] a *better* clean than hand sanitizers[,]" undermining the notion that consumers necessarily view Wet Ones as effective only against those germs that other cleansing methods kill. ER-023 ¶ 35.

fact question as to whether those consumers would find that label contradicted by the seven potential allergens and irritants Appellant alleges the products to contain. *See* ER-033–035 ¶¶ 105–119.

Second, the district court improperly narrowed the definition of "hypoallergenic" to a single conclusive meaning. Citing dictionaries, the court determined that "hypoallergenic" necessarily refers to overall allergenic effect, not chemical composition. *See* ER-014. The court thus concluded that Appellant "must allege she suffered an allergic reaction . . . or that Wet Ones has a higher likelihood of causing a reaction as compared to similar products on the market." ER-014:15–23. That conclusion ignores the definition Appellant cited, which does reference chemical composition. ER-032 ¶ 101(". . . as by containing relatively few or no potentially irritating substances.") What matters is how a "significant portion" of reasonable consumers would interpret "hypoallergenic"; competing dictionary definitions only underscore the presence of a fact question. *See Salazar v. Walmart*, 83 Cal. App. 5th at 568–69 (other plausible interpretations should not be ruled out at the pleading stage); *Dumont*, 934 F.3d at 40 (reasonable consumers not "armed . . . with several dictionaries"). Because evidence, not intuition, should guide the resolution of that question, dismissal on the pleadings was not appropriate.

California takes no position on whether the challenged labeling would *in fact* mislead reasonable consumers—careful consideration of evidence from both sides is needed to resolve that issue—but it was improper for the court to resolve the dispute as a *matter of law* on the pleadings. Under this Court's prior applications of California law, Appellant was entitled to the opportunity to prove her claims by putting forward facts supporting her case. Indeed, considering similar claims, this and two district courts recently denied or reversed motions to dismiss consumer deception causes of action involving similar efficacy representations on hand sanitizer labels. *See Moreno v. Vi-Jon, LLC.*, No. 21-56370, 2022 WL 17668457 (9th Cir. Dec. 14, 2022) at *1, *Mier v. CVS Pharmacy, Inc.*, No. SA CV 20-01979-DOC-ADS, 2021 WL 1559367 at *6 (C.D. Cal. Mar. 22, 2021); *Macormic v. Vi-Jon, LLC*, No. 4:20CV1267 HEA, 2021 WL 6119166 at *6 (E.D. Mo. Aug. 6, 2021). The same result is warranted here.

## CONCLUSION

The district court's judgment should be reversed.

Dated: January 30, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California

*/s/ Hunter Landerholm*
HUNTER LANDERHOLM
BREE BACCAGLINI
Deputy Attorneys General
*Attorneys for Amicus Curiae, the State of California*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-55898

I am the attorney or self-represented party.

**This brief contains 6,480 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Hunter Landerholm **Date** 1/30/2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*